IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TERESA SCHIRM REINBOLT, | ) | CASE NO. 3:15 cv 813 |
| | ) | |
| Petitioner, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | THOMAS M. PARKER |
| | ) | |
| Respondent. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I.    Introduction

Plaintiff, Teresa Schirm Reinbolt ("Reinbolt"), seeks judicial review of the final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act ("Act").  This matter is before the court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

### A.  Procedural History

Reinbolt applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) disability on September 19, 2010.  (Tr. 262-263)  After her application was denied at the pre-hearing levels, Ms. Reinbolt requested a hearing.  (Tr. 109-112)  The first hearing took place before Administrative Law Judge (ALJ) Earl Ashford on October 12, 2011.  (Tr. 75-108)  On October 25, 2011, the ALJ issued a decision finding that Ms. Reinbolt was not disabled.  (Tr. 113-134)  The Appeals Council granted review and vacated the decision and remanded

plaintiff's claim under the substantial evidence provision of the Social Security regulations (20 CFR 404.970 and 416.1470)  The ALJ was instructed to give proper evaluation of the specific functional limitations found by treating physicians Hafeez and Rai and to consider plaintiff's mental residual functional capacity in light of inconsistencies with the ALJ's findings and the state agency psychological opinion  about plaintiff's social interactions.  (Tr. 135-138)

A remand hearing took place on September 13, 2013.  (Tr. 39-74)  The ALJ issued another unfavorable decision on October 23, 2013.  The ALJ determined that plaintiff was not disabled at step five of the sequential evaluation.  (Tr. 15-26)  On December 13, 2013, Ms. Reinbolt requested review.  (Tr. 6)  On February 25, 2015, the Appeals Council denied plaintiff's request for review without substantive explanation, making the ALJ's October 23, 2013 decision the final decision of the Commission.  (Tr. 1-5)  Having exhausted her administrative remedies, Ms. Reinbolt brought this civil action under 42 U.S.C. § 405(g).

## II.  Evidence

### A.  Personal, Educational and Vocational Evidence

Ms. Reinbolt was born on July 31, 1961 and was 49 years old on the date that her application was filed.  (Tr. 82)  She obtained a GED. (Tr. 83)  Ms. Reinbolt's past relevant work includes office assistant, decorator, office manufacturer, and waitress.  (Tr. 66-67)

### B.  Medical Evidence

#### 1.  Medical Records Related to Physical Impairments

The relevant medical records are summarized herein. In April 1996, neurologist, Gary Gerard, M.D., sent a letter to plaintiff's family physician, Dr. Joseph Callaco, informing him that plaintiff was being treated for migraine headaches but that he was unwilling to fill out a disability form for her on the basis of headaches.  (Tr. 500)  An MRI of plaintiff's brain on

2

August 2, 2000 showed normal results.  (Tr. 470)  Neurologist, Glen Nagasawa, M.D., sent a letter to plaintiff's physician on January 14, 2002.  (Tr. 492)  Dr. Nagasawa was seeing plaintiff on a follow-up appointment related to migraine headaches. (Tr. 492)  Plaintiff reported unusual flushing of her skin on her nose and cheeks when she took Celebrex or Protriptyline. (Tr. 492)  However, Dr. Nagasawa otherwise felt that she was doing well and continued her medications. (Tr. 492)

Plaintiff alleges a disability onset of May 15, 2002 due to fibromyalgia, severe pain, migraines, co-occurring interstitial cystitis/painful bladder syndrome, anxiety and adjustment disorder with depressed mood, chronic, bilateral carpal tunnel and chronic fatigue syndrome. (Doc. 9, p. 4)

In June of 2002, after complaining about pain and numbness in her mouth, arms and feet, plaintiff underwent a CT scan of her brain, showing normal results.  (Tr. 658)  Also in June 27, 2002, plaintiff underwent EMG testing of her arms. (Tr. 662-663)  The EMG testing revealed some evidence of carpal tunnel syndrome, but no evidence of radiculopathy.  (Tr. 662-663)

In July 2002, plaintiff had an MRI of her cervical spine performed due to continued complaints of numbness in her arms.  (Tr. 471, 478)  The impression of this MRI showed no frank disc herniation, but disc disease present at C5-6 and C6-7.  (Tr. 471, 478)  The August 5, 2002 notes of Dr. Michael A. Hoeflinger, an orthopedic specialist, state that he had reviewed the MRI scan and discussed with plaintiff that she likely had a "bit of a radiculitis secondary to the bulging disks [sic], even though EMG testing apparently did not show any signs of radicular symptoms.  She shows no sign of any clinical carpal tunnel syndrome." (Tr. 539)

Plaintiff saw physical therapist, James Vitale, for an initial evaluation in August 2002. (Tr. 692-693)  Mr. Vitale noted that plaintiff had painful range of motion in her cervical spine.

3

(Tr. 692-693)  He treated her with heat modalities followed by an active exercise program with emphasis on postural correction.  (Tr. 693)

Also in August 2002, plaintiff returned to Dr. Nagasawa for shoulder and neck pain.  (Tr. 486)  Dr. Nagasawa's notes indicate that he had previously been treating plaintiff for headaches and migraines which seemed to stop once her hormonal manipulation was discontinued.  (Tr. 486)  He suggested that she use some non-steroidal anti-inflammatory medication (NSAID) and wanted to see her back again in two months to see how the physical therapy was going.  (Tr. 486)

Dr. Hoeflinger saw plaintiff again in September 2002 for her pain and numbness.  (Tr. 538, 689-690)  Plaintiff reported that her neck was "doing quite well," that she had regained feeling in her tongue and the side of her face, but that she continued to have numbness in her arms despite having temporary relief with an anti-inflammatory dose pack.  (Tr. 538, 689)  Physical exam revealed that plaintiff had "full painless range of motion of the neck without any radiating symptoms into the upper extremities at all." (Tr. 689)  Dr. Hoeflinger questioned whether plaintiff's symptoms could represent a thoracic outlet syndrome and referred her to Dr. Ralph Whalen, a vascular specialist, for evaluation and treatment if indicated.  (Tr. 689)

Later that month, when plaintiff saw Dr. Whalen, she complained of numbness and tingling in her shoulders, arms, and legs, as well as problems of flushing of the face and neck that "seemed to be associated with some medications that she had been using."  The physical examination of plaintiff was normal, but Dr. Whalen's impression notes indicate numbness of the upper extremities with etiology undetermined.  (Tr. 504)  He recommended that she undergo Doppler studies and shoulder strengthening exercises.  (Tr. 505)

Plaintiff was discharged from physical therapy in October 2002 when she reported that

her present symptom levels had subsided to a tolerable level of central cervicothoracic pain, and low-grade paresthesia in the left bicep area only.  (Tr. 688)  These remaining symptoms were unchanged with cervical movements or her exercises.  (Tr. 688)

In March 2003, plaintiff consulted with rheumatologist, Julianne Orlowski, D.O.  (Tr. 520-522)  Plaintiff complained of diffuse numbness and muscle aches in her elbows, ankles, legs, hips and feet, with sensitivity to touch.  (Tr. 520)  On examination, Dr. Orlowski noted that plaintiff had no tenderness with palpation or percussion throughout her spine.  (Tr. 521)  Dr. Orlowski's notes also state that other healthcare providers do not feel that her "minor cervical disc protrusions" could cause her reported symptoms.  (Tr. 520)  Dr. Orlowski revised her diagnosis from myalgia and myositis NOS to diffuse parasthesias.  (Tr. 522-523)

Plaintiff also saw neurologist, Dileep Nair, M.D., in March 2003.   (Tr. 513-535)   She complained of numbness in her hands, feet and mouth. (Tr. 513)  She described her pain level as a two out of ten.  (Tr. 514)  Dr. Nair's notes state that plaintiff's gait is normal and that there is no focal weakness and "no evidence for sensory deficits," except plaintiff's reflexes were reduced in her arms and legs.  (Tr. 514)  Dr. Nair noted that plaintiff's sleep study showed that she may have restless leg syndrome and prescribed a medication for that condition.  (Tr. 515)

In May 2003, plaintiff saw neurologist, Faizan Hafeez, M.D. (Tr. 684-687)  Plaintiff presented with complaints of numbness and pain in the face, arms and feet.  (Tr. 684-687)  Dr. Hafeez's physical exam did not uncover any abnormalities with the exception of a "patchy loss to cold and pinprick sensations" in her arms and legs.  (Tr. 686)  Dr. Hafeez's impression states that "almost all of the test results have been within normal limits, except for possible neuropathy."  (Tr. 686)  He further states that, "given that she has significant social stressors, and that her neurological exam is non-focal, I am inclined to believe that these symptoms are also

part of her somatization problem, with no organic etiology." (Tr. 686) Dr. Hafeez prescribed pain and anti-inflammatory medication and recommended that plaintiff discontinue taking some of her other medications. (Tr. 686)

Plaintiff went to the St. Charles Mercy Hospital Emergency Center in July 2003. (Tr. 647) She arrived on a backboard with a collar around her neck. (Tr. 647) She had been in an altercation with her husband's ex-girlfriend and reported that she had been pushed, fell backwards, and hit the back of her head. (Tr. 647) Plaintiff's physical examination did not reveal any abnormalities. (Tr. 647) A CT scan of her brain and an X-ray of her cervical spine were ordered and returned normal findings. (Tr. 647)

Plaintiff had an MRI of her lumbar spine in August 2003. (Tr. 655) The results of the MRI were mostly normal with degenerative changes noted and mild disc bulging at L5-S1. (Tr. 655)

Plaintiff underwent a cardiologic examination in September 2003 due to her complaints of chest pain. (Tr. 511, 591-592) Her exam was "completely normal" and the examining physician "reassured her." (Tr. 511) His notes also state that he did not know why she was experiencing total body numbness, but that she had been told that it was stress related. (Tr. 511)

In November 2003, plaintiff saw her primary physician, Karen Sigler, M.D. (Tr. 621-622) She complained of numbness and tingling in her hands and feet. (Tr. 621-622) Plaintiff's physical exam was normal. (Tr. 621-622) Plaintiff reported that she had stopped taking her antidepressant because it made her too sleepy. (Tr. 621) Dr. Sigler opined that plaintiff's symptomology was more related to plaintiff's depression and anxiety. (Tr. 621) Dr. Sigler recommended that plaintiff start taking the antidepressant medication again and prescribed Xanax as well. (Tr. 621)

6

Plaintiff followed-up with Dr. Hafeez in December 2003.  (Tr. 676)  Plaintiff continued to complain of total body numbness and lack of taste sensation.  (Tr. 676)  Dr. Hafeez noted that "none of the investigations have been positive or provided clues to her symptoms and whole body numbness."  (Tr. 676)  Dr. Hafeez concluded that there was no support for an organic etiology of her symptoms and recommended that she follow up with a psychiatrist.  (Tr. 676)

Plaintiff returned to her family care physician, Dr. Sigler, in October 2004.  (Tr. 620)  She complained of pain in the left upper quadrant.  (Tr. 620)   She described it as a pain under her ribcage and a catching when she reached over.   (Tr. 620)  Plaintiff also complained of pains in her legs. (Tr. 620)  Dr. Sigler's notes do not document any complaints of total body numbness or loss of taste at this visit.  (Tr. 620)  Dr. Sigler diagnosed plaintiff with left upper quadrant abdominal pain, restless leg syndrome, hypothyroidism, migraine headaches and generalized anxiety.  (Tr. 620)  Dr. Sigler recommended that plaintiff obtain a CT scan of her abdomen and pelvis.  (Tr. 620)

In December 2004, plaintiff saw Dr. Hoeflinger on complaints of knee and right foot pain. (Tr. 537-538)  Dr. Hoeflinger's physical exam revealed painless range of motion of both hips and both knees, no effusion, no tenderness to palpate, completely normal ligamentous exam of both knees, full range of motion of both ankles, no calf tenderness or swelling and no peripheral edema.  (Tr. 537)  Dr. Hoeflinger referred plaintiff to physical therapy and encouraged her to take her anti-inflammatory medication.  (Tr. 537)  Dr. Hoeflinger notes that plaintiff was continuing to complain of numbness everywhere and suggested that plaintiff consult her psychiatrist.  (Tr. 537)

Plaintiff saw rheumatologist, Mohammed Abusamieh, M.D., in June 2005 for "widespread aches and pains all over her bones and muscles," numbness and stiffness.  (Tr. 644-

646)  Dr. Abusamieh's impression was that plaintiff had fibromyalgia.  (Tr. 645)  She elicited 12

out of 18 tender points for the disease. (Tr. 645)  Plaintiff reported that she rides horses and

walks for exercise and Dr. Abusamieh recommended that plaintiff increase her aerobic exercise.

(Tr. 645)

 In July 2005, an esophogram was conducted after plaintiff complained of difficulty

swallowing and the sensation of having a lump in her throat.  (Tr. 1155)  The esophogram

showed some narrowing of the lumen of the esophagus in the anterior to posterior dimension

without obstruction to the flow of liquids, with an otherwise negative study.  (Tr. 1155)

 Also in July 2005, plaintiff presented to a podiatric surgeon, Theodore Bowlus, D.P.M.,

complaining of numbness, burning, aching, tingling in the feet, legs, hands and joints. (Tr. 1051)

Plaintiff also reported a loss of taste to Dr. Bowlus.  (Tr. 1051)  In October 2005, Dr. Bowlus

performed a biopsy of plaintiff's skin, fat and muscle, which revealed no changes.  (Tr. 1160-61)

 In August 2006, plaintiff visited Dr. Hafeez with complaints of dizziness and

unsteadiness, especially with ambulation.  (Tr. 670)  She also reported increased urination, but

denied any problems with migraine headaches.  (Tr. 670)  Dr. Hafeez's physical examination

was mostly normal but revealed some tenderness to palpation in the occipital and paracervical

regions.  (Tr. 670)  Dr. Hafeez diagnosed well-controlled migraine headaches, fibromyalgia, and

anxiety and depression.  (Tr. 670)  He recommended that plaintiff go to physical and

occupational therapy and enroll in a water aerobics program.  (Tr. 671)

 In September 2006, plaintiff went to the St. Charles Mercy Hospital Emergency

Department.  (Tr. 640-641)  She complained that the numbness in her arms and other extremities

had worsened and that she now had numbness in the roof of her mouth and the sensation of cold

water being poured over her left arm.  (Tr. 640)  The notes from the emergency department state,

"During her stay here in the emergency department, she developed a headache.  She developed some neck pain.  She developed some chest pain in her left shoulder that radiated to her back, sharp in nature.  Her symptoms were somewhat evolving while she was here."  (Tr. 640)  Her physical examination did not reveal anything abnormal.  (Tr. 641)  Plaintiff was diagnosed with paresthesia and atypical chest pain.  (Tr. 641)  She was discharged and told to follow up with her primary care physician and her neurologist.  (Tr. 641)

Plaintiff followed-up with Dr. Sigler on September 26, 2006.  (Tr. 611)  Plaintiff reported the same symptoms that she had reported to the emergency department and stated that the symptoms had worsened. (Tr. 611)  Dr. Sigler diagnosed increasing parasthesias and related it to plaintiff's fibromyalgia symptoms.  (Tr. 611)  Dr. Sigler changed plaintiff's antidepressant medications at this visit.  (Tr. 611)  She also ordered a Doppler study of plaintiff's legs, which came back normal.  (Tr. 611, 587)  Dr. Sigler ordered a CT scan of plaintiff's neck, which showed no evidence of a mass.  (Tr. 611, 588)

In 2006, plaintiff treated with a cardiologist, Dr. James Roberts, Jr. who conducted testing and ruled out heart disease.  (Tr. 540-550)

In March 2007, plaintiff saw cardiologist, Ravi Adusumilli, M.D., for a cardiac evaluation.  (Tr. 585-586)  During this visit, plaintiff told Dr. Adusumilli that she was taking diet pills and that she was getting ready for a trip to Jamaica.  (Tr. 586)  Dr. Adusumilli reassured plaintiff regarding her atypical symptoms.  (Tr. 586)  He did not see any problems related to her heart that would contraindicate her going to Jamaica but advised her to stop taking the diet pills. (Tr. 586)  He also ordered a complete cardio workup to be conducted after she returned from Jamaica.  (Tr. 586)  Plaintiff underwent the cardiac testing in April 2007, including a SPECT test, stress test, and echocardiogram, which returned normal results.  (Tr. 578-79, 581)

In March 2008, plaintiff saw an ear, nose and throat specialist, Dr. Allan Rubin, for decreased hearing.  (Tr. 558-59)  On physical examination, plaintiff's results were mostly normal, but for some nystagmus.  (Tr. 559) Dr. Rubin diagnosed hearing loss, dizziness and tinnitus. (Tr. 559)  Further testing did not reveal any abnormalities.  (Tr. 556-59)  Plaintiff returned to Dr. Rubin the next month for dizziness and vertigo.  (Tr. 561)  Dr. Rubin ordered a vestibular myogenic evoked potential study that revealed normal findings. (Tr. 561)  A vestibular assessment and an MRI of her brain returned mostly unremarkable results.  (Tr. 556, 562, 563)

In April 2008, plaintiff saw rheumatologist, Mabashir Ahmed, M.D., on the referral of Dr. Hafeez.  (Tr. 902-904)  Dr. Ahmed noted that plaintiff's grip and power in all her extremities was a five out of five.  (Tr. 903) Dr. Ahmed gave plaintiff a prescription of Antivert, recommended that she start taking the Lexapro that Dr. Hafeez had prescribed and that she see a psychiatrist for anxiety and depression.  (Tr. 904)  His notes also indicate that, based on his physical exam, his suspicion of her having diffuse connective tissue disease was low.  (Tr. 904)

In July 2008, plaintiff underwent a tilt-table study due to complaints of dizziness, feeling off balance and mental fogginess.  (Tr. 570-571)  The results of the tilt-table test were negative. (Tr. 569)

On July 22, 2008, plaintiff saw Dr. Mahmoud S. Mohamed for a consultation for her headaches, aches and pains, dizziness and possible fibromyalgia diagnosis. (Tr. 604-605)  Dr. Mohamed noted that plaintiff had good strength in her arms and legs and that her gait was steady.  (Tr. 604)  He assessed that her symptoms and clinical history was consistent with fibromyalgia.  (Tr. 605)  He prescribed Celebrex and Flexeril and told her to follow-up in one month.  (Tr. 605)

Dr. Hafeez's treatment notes from March 2009 state that plaintiff had increased energy

10

and concentration but that her energy decreased around 3:00 p.m. (Tr. 898) Dr. Hafeez injected plaintiff's forehead and scalp with Botox on March 20, 2009 to treat plaintiff's headaches. (Tr. 896)

On March 22, 2009, plaintiff went to the emergency room complaining of a migraine headache. (Tr. 747) Plaintiff also complained of dizziness, but walked with a steady gait on examination. (Tr. 747) An MRI scan of plaintiff's brain revealed normal findings. (Tr. 650, 761) A CT scan of her cervical spine revealed degenerative disc disease at the C5 through C7 levels. (Tr. 762) Plaintiff was diagnosed with a migraine headache and was discharged. (Tr. 749)

In May 2009, plaintiff reported to Dr. Hafeez that she had an adverse reaction to the Botox injections. (Tr. 892-893) However, she reported that she was feeling better in May and had improved neck muscle strength and resolution of symptoms of dizziness and forgetfulness. (Tr. 892) She reported feeling some weakness in lifting her head up when laying down or with head down while at work. (Tr. 892) Dr. Hafeez's physical examination of plaintiff in May 2009 revealed no areas of focal muscle weakness or wasting and her neck range of motion and strength were normal in all directions except for some trace weakness and neck extension. (Tr. 892) Dr. Hafeez recommended that she continue exercise, aerobic activity and physical therapy for neck and upper back region. (Tr. 893) Dr. Hafeez produced a medical source statement in April 2010 and stated that all of plaintiff's medications had been ineffective and that she was unable to perform activities of daily living. (Tr. 812-814, 818-820)

In July 2009, plaintiff presented to the emergency room with complaints of pinkish urine and eight out of ten abdominal pain. (Tr. 770) Plaintiff was discharged with a diagnosis for hematuria and stress incontinence. (Tr. 772) Plaintiff followed up with a gynecologist at

11

Maumee Bay OB/GYN on July 9, 2009 and reported vaginal bleeding in addition to blood in her urine.  (Tr. 701)  The gynecologist noted that plaintiff's vaginal tissues appeared healthy, but that plaintiff may have interstitial cystitis (painful bladder syndrome.)  (Tr. 701)

Plaintiff saw Dr. Sigler on July 20, 2009 and complained of low back pain.  (Tr. 610)  Dr. Sigler's notes indicate that plaintiff's lower back had been hurting for two months.  (Tr. 610) The notes also state that plaintiff was being treated for chronic hematuria.  (Tr. 610)  Dr. Sigler found that plaintiff had blood in her urine and recommended a CT scan of her abdomen and pelvis to rule out kidney stones.  (Tr. 610)  The CT scan performed on July 27, 2009 showed normal findings.  (Tr. 777)

An MRI of plaintiff's lumbar spine on September 29, 2009 returned normal findings. (Tr. 648)

Plaintiff saw primary care physician, Krishna Rai, M.D., on October 15, 2009.  (Tr. 943) She complained of urine in her blood and reported a history of migraines.  (Tr. 943)  Dr. Rai produced a medical source statement in March 2010 and noted that plaintiff was not able to work due to health conditions.  (Tr. 809-810)

On January 15, 2010, an MRI of plaintiff's pelvis showed normal findings.  (Tr. 783)

On February 19, 2010, plaintiff underwent a cystourethroscopy that evidenced interstitial cystitis.  (Tr. 846-847)

Plaintiff returned to Dr. Abusamieh on February 24, 2010 complaining of leg and foot pain.  (Tr. 929)  Plaintiff denied unusual fatigue or tiredness even though she did not sleep well. (Tr. 929-932)  Dr. Abusamieh found that her clinical presentation was consistent with fibromyalgia.  (Tr. 932)  He did not see any evidence for inflammatory arthritis or connective tissue disorder.  (Tr. 932)  He emphasized the importance of physical fitness and exercising

12

regularly and gave her a prescription for Lyrica. (Tr. 932)

In March 2010, plaintiff started seeing chiropractor, Robin Swaim, for neck pain. (Tr. 954-956) Plaintiff reported that her neck pain interfered with her driving, sleeping and recreational activities. (Tr. 955) Mr. Swaim noted that plaintiff had moderate tenderness and hypertonicity in her suboccipital area, upper to mid cervical spine on the right, upper back on the right and mid-thoracic area. (Tr. 955) He also noted that plaintiff had reduced cervical range of motion. (Tr. 955-956) Mr. Swaim assessed neck pain, thoracic pain, cervicogenic headaches, and thoracic somatic dysfunction. (Tr. 956) He recommended that she have spinal adjustments twice a week for a two week period. (Tr. 956) On April 16, 2010, plaintiff stated that her neck and upper back had been better. (Tr. 951) However her stiffness was about the same. (Tr. 951) Mr. Swaim noted that plaintiff's progress was as expected and continued treating. (Tr. 952) On April 21, 2010, plaintiff presented with neck pain of four out of ten and Mr. Swaim noted that she was responding slowly to treatment. (Tr. 950) On March 26, 2010, plaintiff told Mr. Swaim that she had awakened stiff head to toe and that she had been on her feet all day yesterday baking. (Tr. 949) Mr. Swaim's notes indicate that plaintiff was responding to treatment at an acceptable rate. (Tr. 949) Mr. Swaim's note from May 10, 2010 states that plaintiff missed her appointment today and when contacted stated that, "she does not wish to reschedule another appointment." (Tr. 948)

Plaintiff returned to Dr. Hafeez in May 2010 and reported having mild headaches twice a week. (Tr. 890) She described her headaches as more on the left than on the right and between a four and eight on a ten point scale. (Tr. 890) Dr. Hafeez noted that plaintiff's recent EMG and nerve conduction study revealed no evidence of neuropathy, radiculopathy, myelopathy or other abnormalities in her arms and legs. (Tr. 890)

13

When plaintiff saw Dr. Hafeez in July 2010, he noted that she was tender all over with maximum pain and tenderness at the sternum, rib cage and arms.  (Tr. 889)  Dr. Hafeez diagnosed fibromyalgia/chronic fatigue syndrome, migraine headaches, depression/anxiety disorder and dizziness. (Tr. 889)  He recommended exercise and physical therapy.  (Tr. 889)  Dr. Hafeez completed another questionnaire regarding plaintiff's abilities in July 2010.

Plaintiff saw Dr. Richard Beham for her yearly hypothyroidism visit in September 2010.  (Tr. 961)  Dr. Beham noted that she was taking Synthroid, Darvocet PM, and Xanax PM.  (Tr. 962)  He recommended that she continue her current treatment and follow up in one year.  (Tr. 961)

In October 2010, plaintiff saw Dr. Rai with complaints of choking a lot, a hoarse voice, and sore neck muscles.  (Tr. 941)  Dr. Rai referred plaintiff to an ear, nose, throat specialist, Dr. Afser Shariff.  (Tr. 934, 941)  Dr. Shariff evaluated plaintiff on October 12, 2010 and believed that plaintiff may have silent reflux.  (Tr. 933)  Dr. Shariff advised plaintiff to avoid alcohol, caffeine and eating before bedtime.  (Tr. 934)

On November 17, 2010, Plaintiff saw Dr. Bowlus.  (Tr. 918)  His notes indicate that plaintiff's left heel Achilles/tendon pain was much better.  (Tr. 918)  On January 11, 2011, plaintiff saw Dr. Bowlus for a twisted right ankle and pain in the ankle and foot.  (Tr. 917)

In March 2011, plaintiff returned to chiropractor, Robin Swaim, and complained of neck, right shoulder, and upper back pain after "shoveling horse stalls" the day before.  (Tr. 983)  Mr. Swaim noted that plaintiff had mild tenderness and hypertonicity in the areas of complaint when palpated.  (Tr. 983)  Her range of motion were slightly restricted but without pain.  (Tr. 983) The right scapula was restricted causing pain and dysfunction involving the neck, upper back and shoulder.  (Tr. 983)

14

On April 11, 2011, plaintiff saw Dr. Hafeez and reported that she had blacked out and hit her head on the wall.  (Tr. 920)  His notes indicate that she was about the same as when he saw her in October.  (Tr. 920)  Plaintiff reported leg and foot pain, total body stiffness and soreness, worsened memory and weekly headaches lasting one to two minutes.  (Tr. 920)  Dr. Hafeez noted that plaintiff's syncopal episode was likely alcohol related.  (Tr. 921)

Plaintiff met with Chiropractor Swaim again in August 2011 and reported that her neck and upper back pain had remained unchanged. (Tr. 977)  However, her dizziness had gone away. (Tr. 977)  Mr. Swaim indicated that plaintiff was not responding to his treatment at all.  (Tr. 977)

An August 2011 X-ray of plaintiff's cervical spine revealed degenerative disc disease. (Tr. 960)  A nerve conduction study of plaintiff's arms in August 2011 returned normal results. (Tr. 962)  In September 2011, an MRI of plaintiff's cervical spine revealed disc degeneration at the C5-C6 and C6-7 levels.  (Tr. 966)

On October 3, 2011, plaintiff saw Dr. Ahmad Zakeri, an orthopedist, on a referral from Dr. Hafeez.  (Tr. 1059)  Plaintiff reported neck, shoulder and left arm pain and tingling.  (Tr. 1059)  Dr. Zakeri noted that plaintiff had not been to pain management and was not taking any medications.  (Tr. 1059)  He also noted that she did not have any weakness and that her gait was normal.  (Tr. 1059)  Dr. Zakeri wanted to try a course of traction on plaintiff.  (Tr. 1060)

Plaintiff went to four physical therapy sessions beginning in October 2011. (Tr. 984)  She was discharged from physical therapy on November 9, 2011 after stating that she was feeling better.  (Tr. 984)

Plaintiff saw Mr. Swaim for an appointment on January 27, 2012.  (Tr. 1000)  She complained of mid-back pain, which began after riding a bull at a club.  (Tr. 1000)

Plaintiff saw Dr. Afridi, a vascular specialist, in 2012.  (Tr. 968)  He reported that

plaintiff's venous scan showed gross reflux in the greater saphenous vein and recommended surgical intervention.  (Tr. 971)

Plaintiff saw Dr. Zakeri for a follow-up appointment on March 28, 2012.  (Tr. 1058)  Dr. Zakeri noted that plaintiff continued to have some neck discomfort but that her radicular symptoms were gone.  (Tr. 1058)  He also noted that her MS work-up was negative and her strength was intact.  (Tr. 1058)  He recommended a course of pain management.  (Tr. 1058)

An X-ray of plaintiff's right foot on March 30, 2012 revealed degenerative changes but "no acute pathology."  (Tr. 1032)  On April 9, 2012, plaintiff saw podiatrist, Dr. Thomas McCabe, and told him that she had pain in two of her right toes which started after she went dancing on March 24th.  (Tr. 1181)

Plaintiff went to urgent care in June 2012 complaining of headaches, dizziness, and a swollen right jaw.  (Tr. 993)  Plaintiff had a normal gait and a symmetric face, but was referred to the emergency room for further evaluation. (Tr. 993-994)  Plaintiff went to the emergency room and underwent a CT scan of her brain that showed minimal small vessel ischemic disease with no restrictive diffusion.  (Tr. 1010-1014)  Plaintiff was diagnosed with a headache and right jaw pain.  (Tr. 1013)  She was discharged and instructed to follow-up with her primary physicians.  (Tr. 1013)

Plaintiff followed up with Dr. Hafeez on June 19, 2012.  (Tr. 1002)  Dr. Hafeez's notes from this visit indicate that plaintiff's memory was fair and that she was exercising regularly. (Tr. 1002)

Plaintiff had an office visit with Mr. Swaim on July 9, 2012.  (Tr. 996)  She complained of pain in her neck, shoulder and lower back.  (Tr. 996)  Mr. Swaim's notes indicate that the pain began on July 2nd after "throwing a bucket of water over the fence."  (Tr. 996)  Plaintiff reported

that taking pain pills gave her relief.  (Tr. 996)

Plaintiff returned to the emergency room on July 21, 2012 complaining of difficulty breathing.  (Tr. 1018)  The emergency room notes state that the patient "experienced dizziness and shortness of breath while out boating today."  Was preparing food and gradually felt dizzy and turned white.  Took ½ Vicodin a few hours earlier and also had [alcohol] drink today.  Skipped breakfast but was snacking today."  (Tr. 1018)  Plaintiff's examination was normal.  She was diagnosed with a migraine headache and discharged with instructions to take Tylenol or Ibuprofen.  (Tr. 1019-1020)

Plaintiff saw Dr. Beham for a follow-up appointment related to her hypothyroidism on September 14, 2012. (Tr. 1130)  Plaintiff's exam was normal including a normal neurological system and minimal palpable tissue with no nodules.  (Tr. 1130)  Dr. Beham did not make any changes to plaintiff's medications and instructed her to follow-up in a year.  (Tr. 1130)

Plaintiff attended five physical therapy sessions between September 2012 and November 2012 to strengthen her muscles as part of her treatment for cystitis and pelvic pain.  (Tr. 1077) When discharged from physical therapy, plaintiff's range of motion was within normal limits and she had decreased pain.  (Tr. 1078)

An X-ray of plaintiff's right wrist taken in December 2012 revealed mild to moderate degenerative changes but no other significant abnormalities.  (Tr. 1030)

Plaintiff saw urologist, Ann Oldendorf, M.D., on January 14, 2013 complaining of bladder spasm and low back pain. (Tr. 1086)  Plaintiff requested and received antibiotics out of concern for having a urinary tract infection during her upcoming vacation to Jamaica in March. (Tr. 1086)

In February 2013, plaintiff underwent a cystoscopy with hydrodistention to treat her

17

interstitial cystitis.  (Tr. 1084-1085)  In April 2013, she had routine bladder irrigation to treat her cystitis.  (Tr. 1135)

On May 6, 2013, plaintiff saw Dr. Hafeez and complained of increased neck and low back pain.  (Tr. 1001)  Plaintiff also reported that she had three to four headaches a week lasting four to six hours.  (Tr. 1001)  Dr. Hafeez noted that plaintiff was doing fair although she was not taking her medication, that her nerve function exam was normal and that her neurological systems were normal.  (Tr. 1001)

In August 2013, ear, nose and throat specialist, Vincent Toma, M.D., saw plaintiff on complaints of intermittent shortness of breath and a feeling that her throat was closing.  (Tr. 1211)  Dr. Toma's exam did not reveal any abnormalities.  (Tr. 1215)

Plaintiff presented to the emergency room on August 18, 2013 with the same complaints of difficulty swallowing and shortness of breath.  (Tr. 1230)  Plaintiff was admitted for a swallowing examination.  (Tr. 1231)  The examination revealed no abnormalities and plaintiff was discharged.  (Tr. 1231)

On August 26, 2013, plaintiff saw Dr. Gary Coleman, an ear, nose and throat specialist who conducted a videostrobosopy of plaintiff's larynx, which revealed some abnormal vocal fold movement.  (1261-1263)  Plaintiff reported having similar symptoms in the past when she had a bad experience with her husband and when her father died.  (Tr. 1261-1263)  She reported that her symptoms had resolved but reappeared now that she was getting divorced.  (Tr. 1262)  Treatment notes indicate that the exacerbation of the problem seemed to be stress related.  (Tr. 1263)  Dr. Coleman assessed that plaintiff's problems were a choking sensation, dysphagia, hoarseness, cough, globus hystericus (having the sensation of an obstruction of the throat when nothing is there), shortness of breath, and paradoxical vocal cord motion.  (Tr. 1261)  Plaintiff's

18

conditions were stable and at a four-month follow up appointment, Dr. Coleman noted that she was doing well and had not had another acute respiratory episode. (Tr. 1264)

### C. Opinion Evidence

#### 1. Treating Physician – Dr. Hafeez

Dr. Hafeez produced a medical source statement in April 2010. (Tr. 812-814) In this statement, Dr. Hafeez states that plaintiff is unable to perform activities of daily living. (Tr. 814) He also states that all of the medications that plaintiff has tried have been ineffective in treating her conditions of fibromyalgia syndrome, chronic fatigue syndrome, migraine headaches and dizziness/vertigo. (Tr. 813-814)

Dr. Hafeez completed another questionnaire regarding Ms. Reinbolt on July 26, 2010. (Tr. 812-814) In this form, Dr. Hafeez indicates that plaintiff could sit 20 minutes at a time for more than two hours but would need to stand and/or lie down after sitting that long. (Tr. 875) He opines that she could stand for five minutes at a time for more than two hours, but would need to lie down then. (Tr. 875) Dr. Hafeez states that Ms. Reinbolt could frequently carry one to two pounds and could occasionally carry less than 10 pounds. (Tr. 876) He also indicates that plaintiff had significant hand limitations reaching, handling, or fingering objects and was severely limited in her ability to deal with work stress. (Tr. 874-876) Finally, he opines that plaintiff would need to take three unscheduled breaks lasting more than 10 minutes and would miss more than three days of work in a month. (Tr. 876)

#### 2. Treating Physician – Dr. Rai

Dr. Rai produced a medical source statement in March 2010 and indicated that plaintiff was not able to work due to health conditions. (Tr. 809-810)

In August 2011, Dr. Rai signed Dr. Hafeez's July 2010 opinion, thereby agreeing that she

agreed with it.  (Tr. 959)  Dr. Rai signed this opinion again on January 16, 2013 stating that

plaintiff's "condition remains unchanged."  (Tr. 1209)

### 3.  Consulting Physician/Psychologists

Consultative physician, William Padamadan, M.D., performed an internal medicine

evaluation on plaintiff in May 2013.  (Tr. 1142- 1144)  After examining plaintiff, Dr. Padamadan

observed no muscle atrophy and intact muscle strength, normal range of motion in her arms,

legs, spine and back, normal toe and heel walking and a normal squat test.  (Tr. 1143-44)  He

also noted that the classic signs of fibromyalgia trigger points were tested and found to be

negative.  (Tr. 1143)  Dr. Padamadan diagnosed functional disorder with a history of

fibromyalgia, migraine headaches, and interstitial cystitis.  (Tr. 1144)  Dr. Padamadan opined

that plaintiff could continuously lift or carry up to twenty pounds and occasionally lift or carry

up to one hundred pounds;  could sit for an entire eight hour workday, and stand or walk for an

entire eight hour workday; could continuously use both hands to reach, handle, finger objects,

feel and push/pull; could continuously operate foot controls; could frequently climb stairs and

ramps, continuously balance, stoop, kneel, crouch, or crawl, but could never climb ladders or

scaffolds; could continuously move mechanical parts, operate a motor vehicle, tolerate exposure

to humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme temperatures, vibrations

and very loud noise.  (Tr. 1149-1154)

Psychologist, James Tanley, Ph.D., conducted a consultative exam of plaintiff on May

11, 2010 and produced a disability assessment report.  (Tr. 822-824)  Plaintiff reported that pain

was the only thing on her mind.  (Tr. 822)  She denied any alcohol use. (Id.)  She reported that

her daily activities included getting up around 10:00 A.M., watching her granddaughter; she

couldn't do chores anymore – her husband did them; she couldn't care for her miniature horse –

her children helped her; she went to bed at 2:00 A.M.; enjoyed bingo; and could sit.  (Tr. 823)

On examination, Dr. Tanley noted that plaintiff was clean, wearing casual attire, was cooperative

with the examiner, had a normal flow of conversation and thought; exhibited an appropriate

affect; had no delusional thinking; had intact memory; had low average intellectual functioning;

and appeared to have "sufficient" judgment.  (Tr. 823)  Dr. Tanley opined that plaintiff was

unimpaired in her abilities to understand and follow simple instructions and maintain attention to

perform simple, repetitive tasks, and moderately impaired in her abilities to relate to others and

withstand the stress and pressure of daily work due to her symptoms.  (Tr. 824)  Dr. Tanley

diagnosed plaintiff with chronic adjustment disorder with depressed mood and assigned her a

global assessment of functioning (GAF) score of 60.

State agency psychologist, Bruce Kelly, E.D., examined plaintiff and assessed her mental

limitations in May 2013.  Plaintiff reported that her chief complaint was "nothing" and that

nothing psychological prevented her from doing work.  (Tr. 1090)  She also reported that she got

along well with her siblings, parent, and children and had no significant problems relating to

neighbors, clerks in stores or public agencies;"  that she was doing "OK" at her part-time job.

(Tr. 1091)  She reported that her daily activities included getting up at 9:30 a.m., house upkeep,

working part-time (12:30 – 4p.m.), eating, feeding animals (miniature horse and goat) when she

felt well, and going to bed between 1:00 and 2:00 a.m.  (Tr. 1091)  Dr. Kelly noted that plaintiff

had driven herself to the appointment from 20 miles away.  (Tr. 1091)  He also noted that she

was appropriately dressed, was generally cooperative, had average cognitive functioning,

appropriate memory, and was mostly normal otherwise.  (Tr. 1092-94)  Plaintiff was also able to

recall seven digits forward and three digits backward, name the current president, and three

major cities. (Tr. 1093-94)  Dr. Kelly made no diagnoses on Axis I or Axis II and assigned

plaintiff a GAF score of 75. (Tr. 1095) He concluded that plaintiff could understand and apply instruction in a work setting consistent with average intellectual functioning, had an average ability to maintain concentration, could respond appropriately to supervision and to coworkers and could respond appropriately to workplace pressures. (Tr. 1095-96)

### 4. Reviewing Physicians

State agency physician, Willa Caldwell, M.D., reviewed plaintiff's medical records and assessed her physical limitations in June 2010. (Tr. 867-873) Dr. Caldwell opines that plaintiff could perform light work, involving lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds; standing and/or walking with normal breaks for about six hours in an eight hour workday; sitting about six hours in an eight hour workday and being able to push and pull with your arms and legs. (867) Dr. Caldwell believed that plaintiff could only occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl, but could never climb ladders, ropes, or scaffolds. (Tr. 868)

State agency physician, Gerald Klyop, M.D., reviewed plaintiff's medical records and assessed her physical limitations in November 2010. (Tr. 883) Dr. Klyop affirmed Dr. Caldwell's opinion. (Tr. 867-873, 883)

On May 23, 2010, Mel Zwissler, Ph.D., reviewed plaintiff's medical records and assessed her mental limitations. (Tr. 862-864) Dr. Zwissler opined that plaintiff had the ability to perform simple and complex tasks in a stable, static work environment with limited, superficial interactions with others. (Tr. 864)

State agency psychologist, Caroline Lewin, Ph.D., reviewed plaintiff's medical records and assessed her mental limitations in October 2010. (Tr. 882) Dr. Lewin affirmed Dr. Zwissler's opinion. (Tr. 862-864)

22

### D.  Testimonial Evidence

#### 1.  Plaintiff's Testimony

##### a.  October 12, 2011 Hearing

The first hearing related to the present social security appeal was held on October 12,

2011.  Plaintiff, whose name was Theresa Schirm at the time, testified that her daughter had

driven her to the hearing.  (Tr. 83)  She testified that she was unable to drive herself more than

20 to 30 minutes.  (Tr. 83)

Plaintiff testified that she was currently working as the fiscal officer assistant for the

Village of Elmore and that she had been doing that for four years.  (Tr. 84)  She testified that she

worked one or two days a week and that she worked from 12:30 to 4:00 p.m. on the days she

worked.  (Tr. 83-84)  Before that, plaintiff worked at a furniture store assisting in preparing

displays for approximately one year.  (Tr. 86)  Prior to that, she was hired as a temporary worker

to do data entry for a factory.  (Tr. 87)  She worked full time at that job in 1998 and 1999.  (Tr.

88)  Before that, plaintiff worked as a waitress and a receptionist at a horse track in Toledo.  (Tr.

88-89)

Plaintiff claims that the onset date of her alleged disability was May 2002.  (Tr. 89)

Shortly after May 2002, plaintiff stopped working at the furniture store and since then has only

worked part-time for the Village of Elmore.  (Tr. 90)

When asked what was keeping her from working right now, plaintiff stated that she has

numbness, like nerve damage, muscle and bone weakness, severe pain, dizziness, and has

blacked out before.  (Tr. 90)  She testified that it was a struggle to work a day or two a week.

(Tr. 90)  She also testified that she gets extremely nauseous and has to lie down.  (Tr. 90) In

describing her pain, plaintiff said it affected her entire body.  (Tr. 91)  She testified that the worst

part was her legs and feet but that she also had pain in her shoulders and arms. (Tr. 91)

Plaintiff testified that she was required to take pain pills for the pain in her legs but that the pain pills did not really help.  (Tr. 91)  She testified that she tried physical therapy, bought a hot tub and tried massage therapy but that nothing really helps.  (Tr. 91-92)  She testified that walking, standing and stress make her pain worse.  (Tr. 92)

Plaintiff testified that, at the time of the hearing, she was regularly visiting Dr. Hafeez, her main neurologist, Dr. Rias, her family doctor, and Dr. Croke [sic] for her condition of interstitial cystitis.  (Tr. 93-94)

Plaintiff testified that she can walk for about a half of a block before needing to sit down. (Tr. 95)  She testified that her husband would fly home and help take care of things that she couldn't do around the house.  (Tr. 95)  She stated that she had stopped going to bingo because it was too uncomfortable to go.  (Tr. 96)

Plaintiff testified that, on a typical day, it would take her one to two hours to get out of bed.  (Tr. 96-97)  She testified that she sometimes takes two to three hot showers a day to get her muscles relaxed enough to move.  (Tr. 98)  She testified that she is unable to watch her grandchildren anymore because it is too difficult.  (Tr. 99)  Plaintiff testified that she has all of the symptoms of MS and has been tested several times but has not been diagnosed with that.  (Tr. 100)  She has been diagnosed with fibromyalgia.  (Tr. 100)

### b.  September 13, 2013 Hearing

After the Appeals Council vacated the ALJ's initial decision, a second hearing was held on September 13, 2013.  Plaintiff testified again at this hearing.  She stated that her previous job at Brush Wellman, which was a factory, had been a desk job.  (Tr. 45)  She started working there part-time and later was made full-time.  (Tr. 44)  She testified that she was doing data entry and

24

was not required to do any lifting at that job.  (Tr. 45)  She stated that she was required to walk at that job, but not more than two hours.  (Tr. 45-46)

Plaintiff testified that she was diagnosed with fibromyalgia in 2002.  (Tr. 46)  She described some of the tests and procedures that were performed in an attempt to determine what was causing her symptoms.  (Tr. 47)

She also provided further explanation as to what was involved in her watching her grandchildren.  (Tr. 48-50)  She explained that she did not watch them all day and that her husband would help her when she was watching them. (Tr. 49)   Plaintiff explained that she was not capable of caring for her miniature horse by herself.  (Tr. 50)  She described it as the same size as a large dog.  (Tr. 50)  So, even when she was required to feed and water it, she was only required to pick up a cup of water and a cup of food.  (Tr. 50)

Plaintiff further explained that, since her first hearing, a lot of medical treatment had occurred.  (Tr. 53)  She described her worst pain in her legs, from the hips down.  (Tr. 53-54)  She described numbness.  (Tr. 54)  She also testified that she had been diagnosed with interstitial cystosis.  (Tr. 54)  She said that she had been told that her whole bladder would need to be replaced.  (Tr. 54)  She testified that she goes once a week for a procedure to treat this problem.  (Tr. 55)  She described her pain associated with this condition as an average of six out of ten, but that some days it was a ten.  (Tr. 56)  She testified that pain began interfering with her ability to work approximately two years ago.  (Tr. 57)  However, she stated that her employer had been willing to work with her and that she was still working at the part-time job for the Village of Elmore.  (Tr. 57-59)

She further explained that she has gone to the emergency room numerous times for dizziness, headaches and shortness of breath.  (Tr. 60-61)  She also testified that her vocal chords

are closing rather than opening.  (Tr. 61)

Plaintiff testified that she needs a lot of assistance when going on vacation.  (Tr. 62)  She testified that her family members take care of her luggage and push her in a wheelchair so that she can go on these vacations.  (Tr. 63)

### 2.  Vocational Expert's Testimony

#### a.  October 12, 2011 Hearing

Vocational Expert ("VE"), Adolph W. Swick, testified at the hearing.  (Tr. 103-107)  At this hearing, the VE considered plaintiff's past relevant work to be the jobs of waitress, receptionist and factory worker.  (Tr. 104)  The VE was told to assume that a hypothetical individual of the claimant's age, education and work experience had the residual functional capacity for light work.  (Tr. 104)  The VE testified that such a person would be capable of working as a waitress and receptionist but the factory worker position would be eliminated due to exertional criteria.  (Tr. 104)

For the second hypothetical question, the VE was also told to assume that the hypothetical individual would not be required to stand or walk for more than four hours in an eight hour workday. (Tr. 104)  The work would be limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements, and involving only work related decisions with few, if any, work place changes. (Tr. 104)  With these additional limitations, the VE testified that the hypothetical claimant would not be able to perform plaintiff's past relevant work.  (Tr. 104)  However, he testified that there were other jobs which the individual would be able to perform.[1]  (Tr. 105)   He stated that sample positions would

---

[1] The VE qualified this response noting that the DOT does not recognize that positions may allow for less than six hours of standing and walking.  (Tr. 105)

include: cashier, with 6,000 state-wide jobs and 180,000 national jobs; shipping weigher, with 1,000 state wide jobs and 24,000 nationally; and packager, with 2,000 state wide jobs and 60,000 nationally.  (Tr. 105)

The VE was then asked to assume that an individual had the residual functional capacity to lift one to two pounds frequently, less than 10 pounds occasionally, and use upper bi-lateral extremities for reaching, handling, and fingering no more than occasionally.  (Tr. 105)  With these limitations added to the hypothetical individual, the VE testified that there would not be jobs available.  (Tr. 106)  When questioned regarding the number of absences that would be tolerated, the VE testified that one to two absences per month were typically tolerated.  (Tr. 106)

### b.  September 13, 2013 Hearing

The VE testified again at the September 13, 2013 hearing.  (Tr. 66-73)  Upon learning more information about plaintiffs' employment at the factory, the VE considered her past relevant work to include office assistant, decorator, office manufacturer, and waitress.  (Tr. 66)  At the hearing, he modified this past relevant work to include data entry clerk, which was the only job that qualified for past relevant work based on the earnings level.  (Tr. 66-67)

For the first hypothetical, the VE was asked to assume an individual of claimant's age, education and work experience had a residual functional capacity for light work, with postural limitations for no climbing of ladders, ropes or scaffolds, frequent climbing of ramps and stairs, occasional balancing, stooping, kneeling, crouching and crawling. (Tr. 67)  The hypothetical individual was also limited to frequent use of the bi-lateral upper extremities for reaching, handling and fingering.  (Tr. 67-68)  The hypothetical individual had environmental limitations to avoid all exposure to hazards such as moving machinery, and unprotected heights.  (Tr. 68)  She also had a verbal limitation for jobs not requiring frequent verbal communications.  (Tr. 68)

27

Work needed to be limited to simple, routine and repetitive tasks with a work environment free of fast paced production requirements involving only work related decisions. (Tr. 68)  The hypothetical individual also needed the limitation of few, if any, workplace changes and only occasional interaction with the general public, co-workers and supervisors.  (Tr. 68)  With these limitations, the hypothetical individual would not be able to perform any past work.  (Tr. 68)

However, the VE testified that such an individual would be able to work as: an electrical accessories assembler, with 2,507 positions available in Ohio and 42,093 positions available in the U.S.; housekeeping cleaner, with 2,611 positions available locally and 77,547 in the U.S.; and laundry worker, with 2,134 positions available in Ohio and 61,139 in the U.S. (Tr. 68)

For the second hypothetical, the VE was also asked if jobs would be available for such an individual at the sedentary level.  (Tr. 69)  The VE testified that such a person could work as a small parts assembler, with 1,216 jobs available in Ohio and 20,420 in the U.S.; a printed circuit board inspector, with 1,082 jobs available in Ohio and 22,156 in the U.S.; and a surveillance system monitor, with 932 jobs available in Ohio and 63,175 in the U.S. (Tr.69-70)

For the third hypothetical, the VE was instructed that the individual must be allowed to sit or stand alternatively at will provided that they are not off task for more than 10% of the workday, they also were limited to no climbing of ladders, ropes or scaffolds, occasional climbing of ramps and stairs, occasional balancing stooping, kneeling, crouching and crawling, a manipulative limitation of occasional use of the bi-lateral upper extremities for reaching, handling and fingering. (Tr. 70-71)  They were also required to avoid all hazards such as moving machinery and unprotected heights (Tr. 71)  They were required to consistently be able to perform even simple, routine and repetitive tasks in a work environment free of fast pace production requirements that involve only work related decisions with few, if any, workplace

changes.  (Tr. 71)  The individual also needed to be allowed to work in isolated conditions with only occasional supervision and be allowed to consistently take three additional, unscheduled breaks of more than 10 minutes each. (Tr. 71)  The individual needed to be allowed to consistently be absent from work for more than three times per month and must be allowed to lie down during the work period at unpredictable intervals for an undetermined amount of times. (Tr. 71)  With these additional limitations, the VE testified that there would be no competitive employment in the local or national economy.  (Tr. 72)  The VE testified that employers would tolerate employees being off task or taking a break approximately 10% of the day.  (Tr. 72)  He testified that they would tolerate one absence per month.  (Tr. 72)

## III.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]....

42 U.S.C. § 423(d)(2)(A).

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,13 claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## IV.    The ALJ's Decision

The ALJ issued a decision on October 23, 2013.  A summary of his findings is as follows:

1. Reinbolt met the insured status requirements of the Social Security Act through June 30, 2010. (Tr. 13)

30

2.  Reinbolt had not engaged in substantial gainful activity since May 8, 2002, the
    alleged onset date.  (Tr. 13)

3.  Reinbolt has the following severe impairments: fibromyalgia; chronic fatigue
    syndrome; interstitial cystitis; degenerative disc disease; carpal tunnel
    syndrome; right wrist osteoarthritis; migraine headaches; anxiety; and
    adjustment disorder with depressed mood.  (Tr. 13)

4.  Reinbolt does not have an impairment or combination of impairments that
    meets or medically equals the severity of one of the listed impairments.  (Tr.
    13)

5.  Reinbolt has the residual functional capacity ("RFC") to perform light work as
    defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally
    balance, stoop, kneel, crouch and crawl and can frequently climb ramps and
    stairs.  She could not climb ladders, ropes, or scaffolds.  She can frequently
    use the bilateral upper extremities for reaching, handling and fingering.  She
    should avoid all exposure to hazards such as moving machinery and
    unprotected heights.  Work should not involve frequent verbal
    communications, and should be limited to simple, routine, and repetitive tasks,
    in a work environment free of fast-paced production requirements, involving
    only work-related decisions, with few, if any, workplace changes.  She can
    engage in occasional interactions with the general public, coworkers, and
    supervisors.  (Tr. 15-26)

6.  Reinbolt was unable to perform any past relevant work.  (Tr. 26)

7.  Reinbolt was born on July 31, 1961 and was 40 years old, which is defined as
    a younger individual age 18-49 on the alleged disability onset date.  She
    subsequently changed age categories to "closely approaching advanced age."
    (Tr. 26)

8.  Reinbolt has at least a high school education and is able to communicate in
    English.  (Tr. 26)

9.  Transferability of job skills is not material to the determination of disability
    because Ms. Reinbolt is not disabled, whether or not she has transferable job
    skills.  (Tr. 26)

10. Considering Ms. Reinbolt's age, education, work experience, and residual
    functional capacity, there are jobs that exist in significant numbers in the
    national economy that she can perform.  (Tr. 26-27)

Based on these findings, the ALJ determined that Reinbolt had not been under a disability from

May 8, 2002 through the date of the decision.  (Tr. 26)

## V.  Parties' Arguments

### A.  Plaintiff

Plaintiff filed her brief on August 21, 2015.  Plaintiff argues that the ALJ erred in determining that she had the residual functional capacity to perform light work and was not disabled.  She argues that his finding lacks the support of substantial evidence because the ALJ failed to apply the proper standards for weighing medical opinion evidence.  (Doc. 9)

Plaintiff also argues that the ALJ's evaluation of credibility was in error.  Plaintiff states that the diagnosis of fibromyalgia was undisputed.  Thus, she contends that the ALJ's use of boilerplate language to support his finding that plaintiff's allegations were not credible to the extent they were inconsistent with his finding of residual functional capacity was improper.  She argues that he was required to consider her credibility before making the determination of her residual functional capacity.  (Doc. 9)

Finally, plaintiff contends that the ALJ's hypothetical to the VE was flawed because it did not account for limitations in her ability to sustain tasks.  She argues that, in forming the hypothetical questions, the ALJ improperly focused on plaintiff's ability to understand a task rather than on her ability to sustain a task.  (Doc. 9)

### B.  Defendant

Defendant filed its brief on the merits on November 19, 2015.  Defendant contends that there was substantial evidence supporting the ALJ's evaluation of the opinion evidence on plaintiff's physical limitations.  (Doc. 13)  Defendant argues that the ALJ was only required to assign controlling weight to the opinion of plaintiff's treating physician if that opinion was well

supported by medically acceptable clinical and laboratory diagnostic techniques and was not inconsistent with other substantial evidence in the record. Defendant contends that the ALJ properly declined to give controlling weight to the opinions of plaintiff's treating physicians and that he stated good reasons for the weight given. (Doc. 13, p. 23) Defendant argues that the ALJ gave little weight to Dr. Hafeez's and Dr. Rai's opinions because their opinions were inconsistent with the medical record. Defendant contends that the ALJ sufficiently articulated good reasons to discount the treating physician opinions in this matter.

Similarly, defendant argues that the ALJ reasonably assigned great weight to the reviewing physicians, Dr. Klyop and Dr. Caldwell. Defendant points out that the ALJ made clear that he fully considered the medical evidence when considering the reviewing physician opinions and that their opinions were consistent with the record, including the conservative recommendations from plaintiff's treating physicians, treatment notes showing that plaintiff had normal neurological examinations, normal strength, normal sensation and a steady gait, and evidence of plaintiff's symptomatology being unrelated to her physical condition. (Doc. 13, p. 27)

Defendant also argues that the ALJ reasonably assessed plaintiff's credibility. (Doc. 13, p. 28) Defendant points to the ALJ's citation of multiple inconsistencies in plaintiff's allegations about the severity of the limiting effects of her impairments and various reports of her functionality.

Finally, defendant contends that there is substantial evidence supporting the ALJ's step five findings. Defendant argues that the ALJ's findings were consistent with the opinions of Dr. Tanley and Dr. Zwissler, the agency examiner and reviewer. Defendant argues that plaintiff has not presented evidence demonstrating that her conditions caused limitations beyond those the

33

ALJ incorporated into the RFC and that the court should affirm the ALJ's decision.

### C.  Plaintiff's Reply

Plaintiff filed a reply memorandum on November 30, 2015. (Doc. 14)  Plaintiff argues that the ALJ improperly gave the greatest weight to the opinions of the non-examining state agency medical consultant by relying on references to "isolated incidents of transient activities, taken out of time and/or context."  (Doc. 14, p.2)  Plaintiff also restates her argument that the ALJ improperly determined the plaintiff's residual functional capacity and then found that her allegations were not credible "to the extent they are inconsistent with the residual functional capacity as described above."  (Doc. 14, p. 5)  The court has fully considered the parties' arguments and its recommendation is stated below.

## VI.    Law & Analysis

### A.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

34

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."  *See Key v.Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307

(7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D.

Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was

discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS

141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist.

LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S.

Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.  Treating Physician Rule

Plaintiff argues that the ALJ did not articulate good reasons for failing to assign

controlling weight to the opinion of plaintiff's treating physicians.  The administrative

regulations implementing the Social Security Act impose standards on the weighing of medical

source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  In making determinations of

disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the

work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir.

2013).  The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source

controlling weight if he finds the opinion well-supported by medically acceptable clinical and

laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the]

case record." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20

C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled

to significant deference or weight that takes into account the length of the treatment and

frequency of the treatment relationship, the supportability of the opinion, the consistency of the

opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. §

416.927(c)(2)-(6).  The ALJ is not required to explain how he considered each of these factors

but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007). The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

The ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). As the Sixth Circuit has noted,

[T]he conflicting substantial evidence must consist of more than the medical

37

opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id.* at 377. On the other hand, the ALJ is not obligated to provide an "exhaustive factor-by-factor analysis." See *Francis v. Comm'r of Soc. Sec.* 414 Fed. Appx. 802, 804 (6th Cir. 2011).

In coming to the decision that Reinbolt has the residual functional capacity to perform light work, with some additional limitations, the ALJ assigned little weight to the opinions of treating physicians, Dr. Hafeez and Dr. Rai, on the issue of Ms. Reinbolt's limitations. (Tr. 24-25) Contrary to plaintiff's argument, the ALJ provided a detailed explanation as to how he arrived at this conclusion. (Tr. 24-25) After providing a summary of plaintiff's extensive medical records, the ALJ pointed out several contradictions in Dr. Hafeez's records and the other medical evidence, including the following:

> * * * For instance, during her initial visit, Dr. Hafeez noted that the claimant had significant social stressors, with a non-focal neurological examination, and concluded that it was possible the claimant's symptoms were part of a "somatization problem, with no organic etiology," and later recommended that she follow up with a psychiatrist. Dr. Hafeez consistently recommended physical therapy and occupational therapy, along with an aerobics or water aerobics program for the claimant, along with increased physical activity, which is inconsistent with restrictions of standing no more than five minutes per day and lifting less than ten pounds only occasionally. Additionally, objective medical testing has been normal, including the claimant's most recent visit with Dr. Hafeez, where he noted that the claimant's neurological examination was normal, as was recently conducted EMG and nerve conduction testing. Additionally, a referral to another neurologist by Dr. Hafeez yielded a normal examination, where the claimant was noted to have tenderness in her neck, shoulder, low back, and hips, and was observed to have good extremity strength. She had normal and symmetrical reflexes, with a steady gait, and was diagnosed with fibromyalgia. Given these findings, the opinions of Dr. Hafeez and therefore those of Dr. Rai[3],

---

[3] Dr. Rai signed the opinions provided by Dr. Hafeez, thereby indicating that she agreed with the opinions provided by Dr. Hafeez.

>   are given little weight, as they are inconsistent with the objective medical
>   evidence, including Dr. Hafeez's own examination of claimant.

(Tr. 24)  The ALJ provided a detailed explanation of his assignment of little weight to the

opinions of Dr. Hafeez and Dr. Rai.  Plaintiff's argument that the ALJ erred in failing to assign

controlling weight to these decisions is not well taken.  Because the opinions of the treating

physicians were not well supported by clinical and laboratory diagnostic techniques and were

inconsistent with substantial evidence in the record, the assignment of weight given to the

opinions of the treating physicians was proper.

The court acknowledges plaintiff's argument that fibromyalgia is a condition primarily

diagnosed by ruling out other conditions.  But the dispute here is not over whether plaintiff has

fibromyalgia; it is over what she is able to do even though she has that condition.  The ALJ

found plaintiff's fibromyalgia to be a severe impairment.  The fact that the condition is

diagnosed by application of differential diagnosis techniques does not mean that once the

diagnosis is made the physician is free from critically evaluating functionality in light of the

patient's clinical presentation and other reports of activities successfully engaged in.

Plaintiff also argues that the ALJ erred in assigning great weight to the state agency

medical consultants who determined that plaintiff was able to perform light work, with sitting,

standing or walking for six hours per day, and occasional stooping, kneeling, crouching and

crawling.  Plaintiff's argument is not well taken.  While the "examining" and "treating"

relationship are factors to consider when weighing opinions, other factors to consider are

supportability and consistency.  20 C.F.R. § 416.927(c).  The ALJ provided a lengthy summary

of plaintiff's medical history.  When assigning great weight to the opinions that plaintiff could

perform light work, the ALJ considered the supportability of that opinion evidence and

concluded that the evidence supported the opinions of the state agency medical consultants.

### A. Plaintiff's Credibility

Plaintiff argues that the ALJ did not clearly explain his finding of credibility in his decision. (Doc. 9, p. 11-13) It is for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997); *Crum v. Sullivan,* 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981). However, the ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." Soc. Sec. Rul. 96-7p, 1996 WL 374186, at * 4. Rather, such determinations must find support in the record. Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Rogers v. Comm'r of Soc. Sec.* 486 F.3d 234, 247 (6th Cir. 2007). The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. The consistency of the various items of information contained in the record must be scrutinized. Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect. *Id.*

Social Security Ruling 96-7p also requires that the ALJ explain his credibility determinations in his decision such that it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's

40

statements and the reasons for that weight." *Id*.  In other words, blanket assertions that the

claimant is not believable will not pass muster, nor will explanations as to credibility which are

not consistent with the entire record and the weight of the relevant evidence. *Id*.

Here, plaintiff contends that the ALJ improperly determined a residual functional

capacity for her and then merely stated that her allegations were not credible to the extent that

they were not consistent with his findings.  (Doc. 9, p. 11-13)  While the ALJ does make this

general statement toward the end of his decision, earlier portions of the ALJ's decision provide a

clear explanation as to how he assessed plaintiff's credibility.  For example, the ALJ provides the

following explanation:

> * * * For instance, the claimant alleged "severe" limiting pain at both hearings,
> which was not alleviated by pain medications, and indicated that she needed a
> wheelchair while on a recent vacation in Jamaica, or while going to the zoo.  She
> further indicated in September of 2010 that her activity level was "almost zero"
> because of her symptoms and side-effects of medications, and testified at her most
> recent hearing that she has problems maintaining a two-hour period where she is
> able to perform her part-time work.  However, the record shows that she was still
> able to engage in activities such as riding horses in June 2005, baking "all day" in
> April of 2010, shoveling horse stalls in March of 2011, riding a "bull" at a club in
> January of 2012, going out dancing in March of 2012, after a trip to Jamaica for
> seven days, and boating in July of 2012.  The record also shows that she reported
> in 2007, before a previous trip to Jamaica, that she had been exercising and losing
> weight.
>
> The claimant testified and indicated in a separate statement that she received
> significant assistance with mobility and personal care while on her most recent
> trip, that she receives some help with household chores, and receives
> accommodations from her part-time employer.  Nevertheless, the record, as noted
> above, does not show that the claimant's impairments have limited her to the
> extent that she has alleged.  Therefore, after having reviewed the entire medical
> record as well as the claimant's testimony and reports in consideration of the
> claimant's complaints of disability, the undersigned does not find the allegations
> credible, as set forth above, to the extent they are inconsistent with the residual
> functional capacity as described above.

(Tr. 26-27)  Thus, the ALJ sufficiently explains why he did not find plaintiff's allegations to be

41

fully credible.

Plaintiff argues that the ALJ made "much ado over a 'vacation in Jamaica'" and the other physical activities gleaned from her medical records.  (Doc. 9, p. 12-13)  She argues that these activities were taken out of context or misquoted.  The court disagrees with the plaintiff's characterization of the ALJ's decision.  Moreover, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001).  "There is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."  *Id.* at 773 [internal quotations omitted.]  The ALJ provided a clear explanation, supported by evidence from the record, as to his findings related to plaintiff's credibility.

### B.  Plaintiff's Capacity to Sustain Work

Finally, plaintiff argues that the ALJ's decision lacks the support of substantial evidence because the ALJ's mental residual functional capacity and hypothetical to the VE failed to account for the capacity to sustain work activity. (Doc. 9, p. 13-15)  Plaintiff argues that the ALJ focused on plaintiff's ability to perform certain mental tasks rather than on her ability to perform sustained work.  (Doc. 9, p. 13-15)  These abilities appear to have been determined, in part, by the opinions of Dr. Tanley and Dr. Zwissler to which the ALJ assigned great weight, but did not fully adopt.  The court notes that there were no treating physicians who provided any opinion evidence related to alleged mental impairments of plaintiff.  According to the record, plaintiff has apparently not sought any mental health or psychological treatment since 2002.  The court also notes that the ALJ was not required to accept the exact language or findings of a medical source in its entirety.  *See, e.g., Deaton v. Astrue,* No. 10-461, 2011 WL 4064028, at *6 (S.D. Ohio September 13, 2011)  Here, the ALJ's RFC assessment reasonably accommodated

42

plaintiff's physical and mental impairments by limiting her to a reduced range of light work with additional no-exertional limitations. (Tr. 15) When asked a hypothetical question based on the ALJ's assessed RFC, the VE testified that, despite the plaintiff's limitations, there were still a significant number of jobs that Ms. Reinbolt could perform. (Tr. 68-69) Plaintiff did not demonstrate that her conditions caused limitations beyond those incorporated into the RFC and the hypothetical question presented to the VE.

## VII. Conclusion

In summary, the ALJ properly considered and weighed the evidence, including the medical opinion evidence and the credibility of Ms. Reinbolt. The ALJ's decision is supported by substantial evidence. Reinbolt has not demonstrated a basis upon which to reverse or remand the Commissioner's decision. For these reasons, the court recommends that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. § 405(g).

Dated: May 23, 2016                              s/Thomas M. Parker
                                                 Thomas M. Parker
                                                 United States Magistrate Judge

**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**